IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LIONEL FRANKS, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| OFFICER MATTHEW HASSEL, et al., | : | No. 11-879 |
| Defendants. | : | |

MEMORANDUM

Schiller, J.                                                                                                                                                                January 10, 2012

     One day in April 2010, Plaintiff Lionel Franks went to a sporting goods store in North Philadelphia to buy a pair of sneakers. Minutes after he left the store, he was arrested by Temple University police officers in connection with a shooting in the area, based largely on the fact that he was wearing the same color sweat suit as the suspected shooter. Franks spent nearly five months in custody before all charges against him were dismissed and he was released from jail. He now brings this false arrest and false imprisonment action pursuant to 42 U.S.C. § 1983 against Temple Officers Matthew Hassel and David Alston and Philadelphia Police Department ("PPD") Detectives Robert Hassel and Michael Acerenza. Currently before the Court are Defendants' motions for summary judgment. For the following reasons, the motions are granted.

I.     BACKGROUND

     On April 9, 2010, Franks, then an eighteen-year-old high school student, went to buy a pair of sneakers at an Olympia Sports store on Germantown Avenue in Philadelphia. (Pl.'s Reply to Defs.' Robert Hassel Jr. and Michael Acerenza Mot. for Summ. J. [Pl.'s Resp. to PPD Defs.' Mot. for Summ. J.] Ex. 8 [Franks Dep.] at 19; *id.* Ex. 24 [PPD Investigation Report] at 8; *id.* Ex. 29 [Security Camera Pictures].) Video surveillance showed that he entered the store at approximately

4:20 p.m. and left with his new sneakers at approximately 4:26 p.m. (Security Camera Pictures.)

At the same time Franks was leaving the store, PPD officers responded to a radio call about a shooting on North Seventeenth Street in Philadelphia. (PPD Investigation Report at 1.) When they arrived on the scene, the PPD officers found a man lying on the sidewalk with gunshot wounds in his face, neck, and belly. (*Id.*) PPD Officer Scott Holmes interviewed a witness, Valerie Logan, who said she saw a man in a green sweat suit run from the scene of the shooting and get into a car. (*Id.* at 4; Pl.'s Resp. to PPD Defs.' Mot. for Summ. J. Ex. 1 [Holmes Dep.] at 8.) Two other witnesses corroborated Logan's description and provided additional details about the shooter's appearance, including approximate height and weight. (PPD Investigation Report at 2-3.) None of the witnesses saw the shooter's face. (*Id.* at 2-4.) A description of the suspect was broadcast over police radio. (*Id.* at 1.)

Temple Officer Hassel heard this flash information and, within minutes, observed Franks only a few blocks away from the site of the shooting. (Pl.'s Resp. to PPD Defs.' Mot. for Summ. J. Ex. 11 [M. Hassel Dep.] at 7.) Franks was wearing a green sweat suit and matched the description broadcast over police radio. (Franks Dep. at 41; M. Hassel Dep. at 8; Pl.'s Resp. to PPD Defs.' Mot. for Summ. J. Ex. 21 [Acerenza Dep.] at 25-27.) Other Temple officers stopped Franks and patted him down while Officer Hassel watched. (M. Hassel Dep. at 7-8.) They did not find any weapons. (Defs.' Matthew Hassel and David Alston's Statement of Undisputed Facts [Temple Defs.' SOF] ¶ 6.) Additional Temple officers, including Officer Alston, arrived a few minutes later. (*Id.* ¶ 7.)

Meanwhile, PPD Officer Holmes and his partner transported Logan from the scene of the shooting to the location where Franks was being held to see if she could identify him. (Holmes Dep. at 9-10; PPD Investigation Report at 4.) Based on his green sweat suit, Logan identified Franks as

the same person she had observed fleeing the scene of the shooting. (PPD Investigation Report at 4.) She did not see Franks's face. (*Id.*) According to Officer Holmes, the PPD officers then informed the Temple officers that Logan had made a positive identification of the suspect. (Holmes Dep. at 9.) Franks disputes this fact, arguing that Officer Holmes lied at his deposition because: (1) an identification based upon clothing alone cannot constitute a "positive identification," and (2) statements made by Officers Holmes and Hassel during the PPD investigation do not specifically mention that the PPD officers told the Temple officers of a positive identification. (Pl.'s Reply to Defendants' Matthew Hassel and David Alston Mot. for Summ. J. [Pl.'s Resp. to Temple Defs.' Mot. for Summ. J.] at 8-12; Pl.'s Statement of Facts Which Preclude Summary Judgment (Document No. 24-2) [Pl.'s SOF] ¶ 10.) It is clear from the record, however, that Officer Holmes viewed Logan's statement as a positive identification and that this information was relayed to the Temple officers. (Pl.'s Resp. to PPD Defs.' Mot. for Summ. J. Ex. 13 [Holmes Investigation Interview Record.]; *id.* Ex. 14 [M. Hassel Investigation Interview Record].) The Temple officers had no direct contact with Logan. (Pl.'s SOF ¶ 10.) Officer Hassel handcuffed Franks and placed him in a Temple police vehicle, which Officer Alston drove to the PPD station. (M. Hassel Dep. at 13-14; Alston Dep. at 14, 16.) At the station, Officers Hassel and Alston completed Franks's initial processing paperwork, writing on one form that Franks "was ID for a shooting." (M. Hassel Dep. at 22; Pl.'s Resp. to PPD Defs.' Mot. for Summ. J. Ex. 12 [Alston Dep.] at 17; *id.* Ex. 16 [Initial Processing Paperwork].)

      PPD then took over the attempted murder investigation and the Temple officers had no further involvement. (Temple Defs.' SOF ¶ 15.) PPD Detectives Hassel and Acerenza were assigned to investigate the attempted murder. (Defs. Robert Hassel Jr. and Michael Acerenza's Statement of

Undisputed Facts ["PPD Defs.' SOF"] ¶ 10.) On the night Franks was arrested for the shooting, Detectives Hassel and Acerenza went to the cell room at the police station to question him and to recover the sweat suit and sneakers he was wearing. (Pl.'s Resp. to PPD Defs.' Mot. for Summ. J. Ex. 5 [R. Hassel Dep.] at 6-7.) Detective Hassel immediately sent the sneakers to PPD's forensic lab to be tested because they had "red marks which appear to be blood." (Pl.'s Resp. to PPD Defs.' Mot. for Summ. J. Ex. 23 [Property Receipt].) On April 29, 2010, Assistant District Attorney ("ADA") Bridget McVan called the lab to request analysis of the evidence before the preliminary hearing then scheduled for May 13, 2010. (Pl.'s Resp. to PPD Defs.' Mot. for Summ. J. Ex. 26 [Lab Case Correspondence File].) ADA McVan spoke to a lab analyst on May 3, 2010, who told her the lab would try to obtain some information for her by the preliminary hearing. (*Id.*) PPD Forensic Scientist Ryan Gallagher completed the lab analysis on May 6, 2010. (Pl.'s Resp. to PPD Defs.' Mot. for Summ. J. Ex. 18 [Gallagher Dep.] at 28-29.) Only one of the sneakers had enough of the substance to be tested, and the result was inconclusive as to whether the substance was human blood. (*Id.* at 14, 17.)

A preliminary hearing was held in Philadelphia Municipal Court on May 25, 2010. (Pl.'s Resp. to PPD Defs.' Mot. for Summ. J. Ex. 7 [Notes of Test.].) When asked whether he had noticed anything about the condition of the shoes Franks was wearing when he was arrested, Detective Hassel testified, "On one of the shoes—there appeared to be blood on one of the shoes." (*Id.* at 34.) On cross-examination by defense counsel, Detective Hassel was asked, "Did you see my client on the surveillance tape in the store buying the sneakers?" ADA McVan's objection on the ground of relevance was sustained and Detective Hassel never answered the question. (*Id.* at 37.)

During the preliminary hearing, defense counsel argued that the green sweat suit was the

4

Commonwealth's only evidence connecting Franks to the shooting. The court responded, "when the defendant is stopped, there appeared to be blood on the sneakers was Detective Hassel's testimony that he saw, so there's some evidence. I can't ignore that evidence." (*Id.* at 46.) Defense counsel protested that this was not evidence because the Commonwealth, despite having a month and a half between the arrest and the preliminary hearing, had not produced any report confirming that the substance on the sneakers was human blood. (*Id.* at 46-47.) The court subsequently asked whether the Commonwealth had analyzed the sneakers, and ADA McVan replied, "I can offer it has been tested. It's human blood. It hasn't been able to be an actual match to anyone. It takes longer than six weeks." (*Id.* at 60.) Based on the record presented at the preliminary hearing, the court held Franks over for trial. (*Id.* at 52.)

On August 6, 2010, a judge ordered Franks to submit a swab of genetic material for DNA analysis and comparison. (Pl.'s Resp. to PPD Def.'s Mot. for Summ. J. Ex. 27 [Order].) When the DNA match came back negative, *nolle prosequi* was entered on all charges against Franks on August 31, 2010. (Pl.'s SOF ¶ 12.) In total, Franks was held in jail for nearly five months before his release.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When the moving party bears the burden of persuasion at trial, it must identify evidence in the record establishing the absence of a genuine factual issue. *Nat'l State Bank v. Fed. Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992). When the moving party does not bear the burden of persuasion at trial, it may meet its

burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable finder of fact to find for the nonmoving party at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, a court must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Spence v. ESAB Group, Inc.*, 623 F.3d 212, 216 (3d Cir. 2010) (internal quotation marks omitted). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

### III.    DISCUSSION

#### A.    Claims Against Temple Officers Hassel and Alston

Franks claims that Temple Officers Hassel and Alston are liable under Section 1983 because they "made deliberate false statements or recklessly disregarded the truth in asserting that a positive identification of him was made" and "the fabrication was material to the finding of probable cause to his arrest." (Pl.'s Resp. to Temple Defs.' Mot. for Summ. J. at 1.)

Section 1983 provides that a plaintiff may bring a lawsuit against a state actor for a violation of a right, privilege, or immunity secured by the Constitution or laws of the United States. *See Berg v. Cnty. of Allegheny*, 219 F.3d 261, 268 & n.3 (3d Cir. 2000). "The Fourth Amendment prohibits a police officer from arresting a citizen except upon probable cause." *Rogers v. Powell*, 120 F.3d 446, 452 (3d Cir. 1997). Thus, an arrest without probable cause can support a Section 1983 false

arrest claim. *Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir. 1978). "[T]he arrestee may also assert a § 1983 false imprisonment claim based on any subsequent detention resulting from that arrest." *Garcia v. Cnty. of Bucks*, 155 F. Supp. 2d. 259, 264 (E.D. Pa. 2001) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 269, 236 (3d Cir. 1995)). Probable cause exists when the facts and circumstances within the arresting officer's knowledge are sufficient to establish a reasonable belief that the individual has committed or is committing a criminal offense. *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003). In assessing the existence of probable cause, courts consider the collective knowledge of law enforcement officers cooperating in an investigation. *O'Connor v. City of Phila.*, 233 F. App'x 161, 165 (3d Cir. 2007).

Qualified immunity provides a defense for government officials who are sued in connection with their exercise of discretionary duties. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation marks omitted). To determine if a government official is entitled to qualified immunity, courts consider whether a constitutional violation has occurred and "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotation marks omitted). District courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. "In the context of a claim of false arrest and imprisonment by a police officer, the officer is entitled to qualified immunity when 'a reasonable officer could have believed that probable cause existed to arrest' the plaintiff." *Ciardiello v. Sexton*, 390 F. App'x 193, 199 (3d Cir. 2010) (quoting *Hunter*,

7

502 U.S. at 228).

Franks contends that Officers Hassel and Alston arrested him based solely upon Logan's identification of his green sweat suit and then wrote in the initial processing paperwork that Logan had positively identified Franks as the shooter. (Pl.'s Resp. to Temple Defs.' Mot. for Summ. J. at 13-15.) Relying on the Bing online dictionary definition of "positive" as "conclusive and beyond doubt or question," Franks suggests that a "positive identification" of a suspect necessarily includes a facial identification, which never occurred here. (*Id.* at 8.) The Court is unpersuaded that the phrase "positive identification" has a singular meaning among law enforcement officials. Though "positive identification" may refer to the strength of the identification in some instances, "positive identification" may also connote nothing more than the opposite of a negative identification. *Compare, e.g.*, *Carter v. Kentucky*, 450 U.S. 288, 291 (1981) ("[B]ecause it had been too dark to get a good view of the men's faces, she could not make a more positive identification."), *with Landano v. Rafferty*, 897 F.2d 661, 680 (3d Cir. 1990) ("The evidence of the negative identification of Landano by Pascuiti and the positive identification of Forni . . . demonstrates that at least two witnesses thought, or possibly knew, that Landano did not fire the gun . . . .") (Rosenn, J., dissenting). Logan told Officer Holmes that Franks, based on his distinctive green sweat suit, appeared to be the man she had seen fleeing the scene of the shooting; thus, she made a positive identification. Because the knowledge of an officer cooperating in an investigation is imputed to the arresting officers, it is irrelevant whether Officer Holmes actually told the Temple officers that Logan had made a positive identification.

At any rate, the ultimate issue is whether Officers Hassel and Alston reasonably could have believed that probable cause existed to arrest Franks based on the facts and circumstances within the

collective knowledge of the PPD and Temple officers at the time. Franks was seen mere blocks from the scene of a near-fatal shooting only a few minutes after it occurred. As confirmed by Logan's positive identification, Franks fit the description provided by three different witnesses. "The question is whether the description of the assailant[], as well as the time and geographic factors, were sufficient for a prudent man to believe that [the arrestee] had committed the offense." *United States ex rel. Wright v. Cuyler*, 563 F.2d 627, 630 (3d Cir. 1977). In some situations, unusual clothing and proximity to the crime in time and place may suffice. *See, e.g.*, *United States v. Carpenter*, 342 F.3d 812, 814 (7th Cir. 2003) ("[The arrestee] was wearing a distinctive outfit—the white designer jacket and tiger-embellished jeans—just six hours after a man wearing an identical outfit robbed a bank. In these circumstances, [the arrestee's] clothing alone might have established probable cause for his arrest . . . ."). The Court need not decide whether probable cause existed here, however, as the question is close enough to satisfy the Court that no clearly established law prohibited an arrest under the circumstances. *See Pollack v. City of Phila.*, 403 F. App'x 664, 669 (3d Cir. 2010). Therefore, Officers Hassel and Alston are entitled to qualified immunity, and the Court will grant summary judgment in their favor.

      **B.**    **Claims Against PPD Detectives Hassel and Acerenza**

Franks asserts that PPD Detectives Hassel and Acerenza are liable under Section 1983 because they "made a deliberate omission and recklessly disregarded the truth in falsely asserting at the plaintiff's May 25, 2010, preliminary hearing that blood, and by implication, human blood, was found on one of the plaintiff's sneakers." (Pl.'s Resp. to PPD Defs.' Mot. for Summ. J. at 1.) Even if Detective Acerenza, who did not testify at the preliminary hearing, could be held responsible for the testimony of Detective Hassel, there is no evidence that Detective Hassel lied when

questioned during the preliminary hearing. Detective Hassel, responding to a series of questions about Franks's clothes on the night of his arrest, said that "there appeared to be blood on one of the shoes." (Notes of Test. at 34.) Detective Hassel was never asked by ADA McVan or defense counsel whether the substance on the shoes had been tested. Thus, whether or not Detective Hassel knew about the results of the lab analysis at the time he testified, his testimony was truthful.[1]

Plaintiff further contends that Detectives Hassel and Acerenza "failed to tell the Court at plaintiff's preliminary hearing that they had in their possession security video from Olympia Sports showing the plaintiff entering the store at the same time as the shooting." (Pl.'s Resp. to PPD Defs.' Mot. for Summ. J. at 2.) In fact, defense counsel directly questioned Detective Hassel about the surveillance tape, but Detective Hassel did not have the opportunity to respond because ADA McVan's objection to the question was sustained.

Moreover, Franks relies on a legal standard set forth in cases involving false statements and omissions in applications for arrest warrants. *See Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000) (holding that a police officer may be held liable for false statements or omissions in an arrest warrant application if they are material to a finding of probable cause). These cases do not stand for the proposition that Detectives Hassel and Acerenza had an affirmative obligation to inform the preliminary hearing court of exculpatory evidence. For both false arrest and false imprisonment claims, the inquiry turns on whether probable cause to arrest existed. *See Groman*, 47 F.3d at 636.

---

[1] Based on the record in this case, ADA McVan's representation to the court during the preliminary hearing that the substance "has been tested" and "[is] human blood" may well have been inaccurate. (Notes of Test. at 60.) But the propriety of ADA McVan's conduct is not at issue here; Franks himself acknowledges that "[a]s ADA McVan enjoys absolute immunity[,] she is not a party to this action." (Pl.'s Resp. to PPD Defs.' Mot. for Summ. J. at 6 n.3.) Of course, this does not foreclose an inquiry by the Disciplinary Board of the Supreme Court of Pennsylvania.

The preliminary hearing testimony of Detective Hassel had no bearing on the existence of probable cause at the time of Franks's arrest. *Cf. Baker v. McCollan*, 443 U.S. 137, 145 (1979) ("The Constitution does not guarantee that only the guilty will be arrested."); *Davis v. Malitzki*, App. A. No. 10-1903, 2011 WL 5591657, at *3 (3d Cir. Nov. 17, 2011) ("[E]vidence that might exonerate a defendant does not defeat probable cause."). Because Plaintiff has failed to point to any culpable conduct on the part of Detectives Hassel or Acerenza, the Court will grant summary judgment in favor of these Defendants.

### IV.   CONCLUSION

The Court holds that Temple Officers Hassel and Alston are entitled to qualified immunity as a matter of law and that PPD Detectives Hassel and Acerenza did not commit any constitutional violations. Therefore, the Court will grant summary judgment in favor of all Defendants. An Order consistent with this Memorandum will be docketed separately.